JODI LINKER, Bar No. 230273
Federal Public Defender
Northern District of California
GABRIELA BISCHOF, Bar No. 272973
Assistant Federal Public Defender
13th Floor Federal Building - Suite 1350N
1301 Clay Street
Oakland, CA 94612
Telephone: (510) 637-3500
Facsimile: (510) 637-3507
Email: Gabriela_Bischof@fd.org

Counsel for Defendant Gilbert

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| UNITED STATES OF AMERICA, | Case No.: CR 23–444 YGR |
|---|---|
| Plaintiff, | **SENTENCING MEMORANDUM** |
| v. | Court: Courtroom 1, 4th Floor |
| RAY GILBERT, | Hearing Date: June 12, 2025 |
| Defendant. | Hearing Time: 10:00 a.m. |

### INTRODUCTION[1]

From the time he was 14 years old, Ray Gilbert has been taken from his family and sent into carceral settings. These interventions, designed to deter him from criminal conduct and promote respect for the law, have not had their intended effect. In part, that is because Mr. Gilbert found himself in the custody of bad actors who grossly abused their power, but in greater part, it is because

---

[1] As the Court is aware, Mr. Gilbert's sentencing has been delayed while the parties awaited the Ninth Circuit's en banc decision in *United States v. Duarte*. Mr. Gilbert requests that the Court continue sentencing until the Supreme Court has decided whether it will grant certiorari, likely in autumn 2025. The government opposes a continuance of the sentencing on that basis. If the Court denies this request, he submits the following sentencing memorandum in support of his request for a time-served sentence.

SENTENCING MEMORANDUM
*GILBERT*, CR 23–444 YGR

1

losing his freedom and being separated from his family did not give him the tools to pursue a rewarding, lawful life once released. Mr. Gilbert has already served a 24-month sentence in this case, not including the seven months he has been at the halfway house. Before Mr. Gilbert was released to the halfway house, the parties agreed that if the Court imposed a 24-month sentence, "as of October 25, 2024, Mr. Gilbert would be likely overstaying his prison sentence." Dkt 67. He was released on October 24, 2024. Dkt. 72. The government now suggests that only a 30-month sentence "would promote respect for the law and deter Gilbert from future misconduct." Dkt. 87 at 10.

Mr. Gilbert requests that the Court impose the 24-month time-served sentence followed by three years of supervised release, during which he can take advantage of Probation's resources to participate in the therapy he needs, get the education necessary to pursue his dreams of being a barber or automotive technician, and demonstrate that he can live a law-abiding life. If the Court is unconvinced that Mr. Gilbert is ready to be an asset to the community, undersigned counsel respectfully suggests that the inclusion of an additional six month term of home confinement at his mother's home in Fremont (well away from the Oakland areas in which his criminal history originates) which he would be allowed to leave for employment, education, and medical purposes such as therapy, would better satisfy the purposes of punishment set forth in 18 U.S.C. § 3553(a).

## ARGUMENT

Mr. Gilbert is a young man with a longer and more severe history of trauma than most. Traditional terms of incarceration did not deter him from possessing a firearm and ammunition on August 16, 2023, and a close examination of his history clearly reveals why. First, he was born into neighborhoods plagued with violence: his father was shot to death when Mr. Gilbert was only five years old, his uncle, grandfather, and two childhood friends were also victims of gun violence later in his childhood, and Mr. Gilbert himself was first shot in his chest when he was only 13 years old. He has been shot a total of five times. He was born into a world that was violent and unpredictable, and the world of his youth has haunted his adult decisionmaking.

Moreover, Mr. Gilbert has not been able to access safety through the law. As a child, he was beaten by staff in reform schools and silenced when he tried to report the abuse. As an adult, Antioch

Police officer Morteza Amiri ordered his K9 to attack Mr. Gilbert without cause, and Mr. Gilbert was seriously injured. Mr. Amiri was convicted this year of deprivation of rights under the color of law for another incident in which he used his K9 to attack another detainee without sufficient cause.[2]

While retribution may have its place, Mr. Gilbert is a man in need of guidance and rehabilitation rather than pure punishment and incapacitation. Filling his days with family, employment, learning, and mental health treatment will make the community safer than separating him from his family and filling his days with jail time and incarcerated companions ever could. The six additional months of incarceration the government suggests would treat none of his underlying issues and would be too little time for him to enroll in, let alone complete, rehabilitative programming in custody. The parties and Probation are all in agreement that Mr. Gilbert's Total Offense Level is 17, his criminal history category is III, and his guidelines range is 30 to 37 months. Presentence Report ("PSR") ¶¶ 15-24; 68. The 24-month sentence Mr. Gilbert requests is a 6-month downward variance from the low end of his agreed-upon guidelines. There are ample reasons for the Court to impose that modest variance.

### 1. Applicable Law

Criminal "punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). That requires "the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quotations omitted). The sentence recommended is just one factor for district courts to consider, and it may not be weighed more heavily than any other § 3553(a) factor. *Gall*, 552 U.S. at 50; *see also United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc). Moreover, the Court can vary downward specifically due to a defendant's disadvantaged background and mental health issues. "Evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems,

---

[2] *See United States v. Morteza Amiri*, 4:23-cr-00269-JSW, Dkt. 390.

may be less culpable than defendants who have no such excuse." *California v. Brown*, 479 U.S. 538, 545 (1987). This Court has the discretion to sentence Mr. Gilbert to a 24 month time-served sentence pursuant to the sentencing goals set out in 18 U.S.C. § 3553(a) for the reasons discussed below.

## 2. The Court Should Vary Downward Due to Mr. Gilbert's Disadvantaged Youth

Mr. Gilbert is the oldest of six children. ¶ 49. His mother was a teenager and his father in his early twenties when Mr. Gilbert was born. *Id*. Mr. Gilbert's earliest memory was of living with his grandmother, Collete Dunn, at a house on 35th Avenue in Oakland. He lived there with his mother, two aunts, one uncle, and five cousins. The five adults and six children shared a four-bedroom house, and Mr. Gilbert's family slept in the living room on beds and couches. Mr. Gilbert and his cousins were all in the same age range and he remembers it as a happy time; they used to play in the park across the street from the house all the time. His father didn't live there with his mother, but Mr. Gilbert remembers that he would come over and visit. Mr. Gilbert's family moved back and forth between West and East Oakland while he was growing up. Ms. Bonner now lives in Fremont with two of Mr. Gilbert's younger sisters, who are ages 4 and 8. ¶ 49.

### A. Gun Violence

Despite the closeness of his family, Mr. Gilbert grew up in a dangerous world where firearms are commonplace and fear of being shot is always present.. In the areas where Mr. Gilbert lived, gun violence was commonplace and it affected him and his family near-daily. Mr. Gilbert's father, Ray Gilbert, Sr., was shot to death in West Oakland in 2004. ¶ 49-50. Mr. Gilbert, Sr. was 28; Ray was about to turn six. *Id*. The suddenness and violent nature of his death was difficult for Mr. Gilbert to process at such a young age. At the time his father was murdered, his family lived around the corner from the funeral home where the funeral took place, and he was reminded of his father's death every day when they drove by. They kept his father's ashes in the house and never spread them.

Mr. Gilbert was close to his grandfathers but they both died while he was in high school. ¶ 50. One grandfather was shot and killed. Mr. Gilbert's uncle was also shot and killed. *Id*. Many of Mr. Gilbert's childhood friends were also victims of gun violence. *Id*.

In addition to the loss of family and friends to gun violence, he was also the victim of gun violence himself. When he was only 13 years old and playing in his neighborhood, he suffered a gunshot wound to the lower chest. ¶ 57. The bullet fractured his rib, grazed internal organs, and settled in his back. ¶ 50. He experienced complications from leaving the bullet inside and ultimately had to have surgery to have the bullet removed. ¶ 57. He was hospitalized three times between the ages of 19 and 20 for gunshot wounds in his leg and abdomen. *Id*. His internal injuries were so serious that he had to have his spleen removed. *Id.*

Mr. Gilbert has never had the benefit of therapy to address the sudden, violent losses of his family and friends, the trauma of his own injuries, or the resulting everpresent fear that he will be the victim of violence again. ¶ 59.

### B. Reform Schools

Mr. Gilbert's history led him to the not wholly unreasonable conclusion that he or someone he loved could be the victim of violence at any time. His experiences also convinced him that law enforcement was unlikely to offer the protection he desired. Mr. Gilbert was court ordered into reform schools beginning at age 14. Mr. Gilbert missed his mother and siblings terribly and he walked away from two reform schools, one in Atascadero after a week and one in Los Angeles after several months. ¶ 51. Alameda County Probation then arranged for him to be sent to the Glen Mills School, a juvenile detention facility in Pennsylvania. The first time staff laid hands on him was his third day there. Mr. Gilbert was taken into an office with three staff members and a staff member was screaming at him so aggressively that spittle was coming out of his mouth and landing on Ray's face. Mr. Gilbert tried to tell the staff member to "get out of my face, please" but they took that as a sign of disrespect and started punching him. Mr. Gilbert tried to defend himself, but "when a kid does that, they call more staff and then they overpower you."  Five total staff came into the room, and he ended up being held down on a table with staff members holding his arms and stepping on his feet to immobilize him while other staff punched him repeatedly. He was unable to defend or protect himself. *Id.*

When Mr. Gilbert's probation officer came for her first visit, it was just two weeks into Mr. Gilbert's stay at Glen Mills. He asked to speak to her about the incident privately but she dismissed

him as a liar. ¶ 51. Instead of protecting him, she told staff that he had reported them and the staff punished him by moving him to a different residence hall, openly calling him a "snitch" in front of other staff and residents (in order to prompt them to attack him) and kept him on "Staff Watch" with no access to activities, haircuts, basketball or anything other than school.

It wasn't the last time that staff abused him, but it was the last time he tried to report it. ¶ 51. While he was there, he saw other children subjected to even worse abuse. Memorably, another resident had to be hospitalized after staff broke his ribs. Staff obscured the abuse by claiming that the injuries were the result of fights between residents. Mr. Gilbert was at Glen Mills for 18 months. *Id*. Glen Mills lost its accreditation in 2019 after a newspaper exposé called attention to the rampant abuse.[3] Based on the findings of its own investigation, the Pennsylvania Department of Public Health ordered the immediate removal of all boys there,[4] concluding that "Glen Mills failed to protect the youth in its care, placed youth at risk of serious physical injury, permitted youth to sustain physical injuries by their acts and failure to act, and Glen Mills engages in a culture that instills fear in youth through coercion and intimidation. As a result, we find that the youth placed at Glen Mills are at imminent risk and their safety is in jeopardy." *Id.* at 6-7. Mr. Gilbert was ultimately placed in Lakeside Academy, where he was not abused and was able to graduate successfully.

As an adult, Mr. Gilbert was the victim of a violent attack by a police dog. ¶ 43. Although Officer Amiri, who ordered the animal to attack Mr. Gilber, claimed he had not complied with a command to get on the ground, Mr. Gilbert already had his hands spread on the vehicle and was making his way down when the attack occurred. In connection with the attack on Mr. Gilbert, Officer Amiri was "referred for counseling after a review of the incident determined that the K9 deployment was inconsistent with the department's best practices." *Id.*

Most people can rely on the protection of the police when they are in danger and do not feel the need to resort to possessing firearms. Because of his experiences as a juvenile in reform schools and

---

[3] *See e.g.* Ted Goldberg, *How California Teens Wound Up at Pennsylvania School Accused of Battering Students,* KQED (April 19, 2019), https://www.kqed.org/news/11742455/how-california-teens-wound-up-at-pennsylvania-school-accused-of-battering-students

[4] *Pennsylvania Department of Public Health Removal Order and Findings*, March 25, 2019, https://embed.documentcloud.org/documents/5780143-Final-Glen-Mill-Emergency-Removal-Order-3-25-19/

SENTENCING MEMORANDUM
*GILBERT*, CR 23–444 YGR

later being attacked by the police dog, that police protection did not feel available to Mr. Gilbert. Mr. Gilbert's negative experiences amplified the fear he already had that he was in danger of being shot and contributed to his desire to possess firearms.

### C. Criminal History and Circumstances of the Offense

The government argues that Mr. Gilbert's criminal history supports an additional custodial term, but their summary relies on unconvicted, unreliable accusations. "[D]ue process requires that a defendant be sentenced on the basis of accurate information. Thus, a district court may consider any relevant information, 'provided that the information has sufficient indicia of reliability to support its probable accuracy.' " *United States v. Alvarado-Martinez*, 556 F.3d 732, 734–35 (9th Cir. 2009) (citation omitted) (quoting U.S.S.G. § 6A1.3(a)). While it is accurate that Mr. Gilbert previously possessed multiple firearms, that desire is defensive and informed by the loss of his father, grandfather, uncle and friends, as well as his own experiences being shot. What is not accurate is the insinuation that he ever used those firearms to assist in a robbery or cause physical harm to any person.

Mr. Gilbert has suffered three adult convictions, none of which were violent. In one incident, he was convicted of two felonies: reckless evading and illegally possessing a firearm, and in the other he was convicted of being an accessory to what the government describes as an organized retail theft from the Gap. ¶ 32-33. The government relies heavily on unconvicted conduct to make the unsupported accusation that Mr. Gilbert is involved in "gang robberies." Dkt. 87 at 6-7. They describe an incident in which suspects driving a gray Toyota robbed a woman in her car. ¶ 45. Mr. Gilbert's tenuous connection to the robbery is that hours later he was seen coming out of a gym with friends and getting in the back seat of the suspect vehicle. *Id*. Mr. Gilbert was not identified by the victim, was not identified by witness or geolocation data as being at the scene of the robbery, and no indicia from the robbery victim was found within his belongings. *Id*. Although a gun was found in his backpack, a gun was not used in the robbery. *Id*.

In the present case, the government sought a search warrant for the Oakland residence where Mr. Gilbert was staying, a place known to be an illegal gambling facility, and where Mr. Gilbert was suspected to be a security guard. ¶¶ 8-10. They found a firearm and extended magazine under the

bed in a room containing Mr. Gilbert's indicia and some of his clothing. *Id*. Although NIBIN hits linked the weapon to a murder two weeks prior, even the government was forced to concede that there is no "direct evidence that Gilbert was responsible for the murder." Dkt. 87 at 3, *see also* ¶ 10.

The robbery and murder insinuations are highly inflammatory. But at most, the government's evidence shows that Mr. Gilbert is connected to people and places that are negative influences. Based on the facts presented, the Court cannot conclude that Mr. Gilbert was personally responsible for violent conduct, nor should it penalize him for associations rather than conduct. Further time in custody will only place Mr. Gilbert closer to negative influences, whereas time with his mother and younger sisters in Fremont will distance him from them.

### D. Release

Mr. Gilbert was released to the halfway house on October 24, 2024. After returning back late twice, he was placed on lockdown in January 2025 and has been at the halfway house since. The government points to two images posted to his Instagram account in March 2025 as evidence that he has not been reformed, but it is reading too much into non-criminal conduct. Dkt. 87 at 5. It would have been physically impossible for those photos to document a new possession of a firearm because Mr. Gilbert had not left the halfway house in two months at the time they were posted. Moreover, residents are searched every time they enter from outside. While posting historical photos of firearms possession (or even photos of other people with firearms) is not appropriate behavior, it is unlikely that if Mr. Gilbert was on supervised release such conduct would have resulted in a custodial sanction. Moreover, had Mr. Gilbert been working or going to school rather than bored and lonely at the halfway house on lockdown, it is unlikely he would have posted the images in the first place. Except for two tardy returns, Mr. Gilbert has abided by the (many, strict) rules of the halfway house for over seven months. Contrary to the government's assertion that Mr. Gilbert is "not amenable to supervision," seven months of compliance is evidence that he is prepared to follow the rules to get his life back on track. The Court should give him that chance.

### CONCLUSION

Section 3553(a) instructs courts to impose the lowest sentence necessary to achieve the purposes of sentencing. At the heart of this case is the fact that rehabilitative measures can promote

respect for the law, deter future crime, protect the public, and provide needed treatment far better than six more months in Santa Rita Jail ever could. Accordingly, Mr. Gilbert respectfully requests that the Court sentence him to time-served (24 months), followed by three years of supervised release.

Dated: June 5, 2025

Respectfully submitted,

JODI LINKER
Federal Public Defender
Northern District of California

　　　　　　　/S
GABRIELA BISCHOF
Assistant Federal Public Defender